Brian A. Knutsen, WSBA No. 38806
Jessica Durney, WSBA No. 57923
KAMPMEIER & KNUTSEN, PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Tel.: (503) 841-6515 (Knutsen)
        (206) 739-5184 (Durney)
Email: brian@kampmeierknutsen.com
        jessica@kampmeierknutsen.com

Simone Anter, WSBA No. 52716
COLUMBIA RIVERKEEPER
407 Portway Avenue, Suite 301
Hood River, Oregon 97031
Tel.: (541) 399-5312
Email: simone@columbiariverkeeper.org

*Attorneys for Plaintiff Columbia Riverkeeper*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COLUMBIA RIVERKEEPER,

        Plaintiff,

        v.

PORT OF VANCOUVER U.S.A.,

        Defendant.

Case No. 3:21-cv-05486

COMPLAINT

## I.   INTRODUCTION

1.   This action is a citizen suit brought under section 505 of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, as amended. Plaintiff Columbia Riverkeeper ("Riverkeeper") seeks declaratory and injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees for Defendant Port of Vancouver U.S.A.'s ("Port") repeated and ongoing violations of section 301(a) of the CWA, 33 U.S.C. § 1311(a), and of the

COMPLAINT - 1
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

terms and conditions of the Port's National Pollutant Discharge Elimination System ("NPDES")

permits authorizing discharges of pollutants from Port's facility to waters of the United States.

## II.    JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under section 505(a) of the CWA, 33

U.S.C. § 1365(a) (CWA citizen suit provision), and 28 U.S.C. § 1331 (federal question). Port is

in violation of an "effluent standard or limitation" as defined by section 505(f) of the CWA, 33

U.S.C. § 1365(f). The relief requested herein is authorized by sections 309(d) and 505 of the

CWA, 33 U.S.C. §§ 1319(d) and 1365 and 28 U.S.C. §§ 2201 and 2202.

3.      In accordance with section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A),

Riverkeeper notified the Port and its Commissioners of the Port's violations of the NPDES

permit and of Riverkeeper's intent to sue under the CWA, by letter dated and postmarked

November 5, 2020 ("Notice Letter"). A copy of the Notice Letter is attached to this complaint as

Exhibit 1. Riverkeeper also notified the Administrator of the United States Environmental

Protection Agency ("EPA"), the Administrator of EPA Region 10, and the Director of

Washington Department of Ecology ("Ecology") by mailing copies of the Notice Letter to those

officials on November 5, 2020.

4.      At the time of the filing of this complaint, more than sixty days have passed since

the Notice Letter and copies thereof were issued in the manner described in the preceding

paragraph.

5.      The violations complained of in the Notice Letter are continuing and/or

reasonably likely to recur. The Port is in violation of section 301(a) of the CWA, 33 U.S.C. §

1311(a) and its NPDES permit.

COMPLAINT - 2
No. 3:21-cv-05486

6.      At the time of the filing of this complaint, neither the EPA nor Ecology has commenced any action constituting diligent prosecution to redress the violations alleged in the Notice Letter.

7.      The source of the violations complained of is located in Clark County, Washington, within the Western District of Washington, and venue is therefore appropriate in the Western District of Washington under section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1).

### III.      PARTIES

8.      Plaintiff Columbia Riverkeeper is suing on behalf of itself and its members. Riverkeeper is a 501(c)(3) non-profit corporation registered in the State of Washington. The mission of Riverkeeper is to restore and protect the water quality of the Columbia River and all life connected to it, from the headwaters to the Pacific Ocean. To achieve these objectives, Riverkeeper implements scientific, educational, and legal programs aimed at protecting water quality and habitat in the Columbia River Basin. This lawsuit is part of Riverkeeper's effort to improve water quality in the Columbia River Basin for purposes including recreation, habitat quality, and subsistence, recreational, and commercial fishing.

9.      Riverkeeper has representational standing to bring this action. Riverkeeper has over 16,000 members, many of whom reside in the vicinity of waters affected by the Port's discharges of pollutants. Members of Riverkeeper use and enjoy the waters and the surrounding areas that are adversely affected by the Port's discharges. Riverkeeper's members use these areas for, *inter alia*, fishing, swimming, hiking, walking, photography, boating, and observing wildlife. The Port has consistently violated the conditions of its NPDES permits, exceeded the permits' benchmark pollutant discharge levels, and discharged pollutants to waters of the United States without an NPDES permit in violation of section 301(a) of the CWA. Riverkeeper has serious concerns about the impacts of the Port's operations and pollution discharges on the Columbia

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

1   River. The Port's operations and pollution discharges degrade water quality in the Columbia

2   River Basin. The environmental, health, aesthetic, and recreational interests of Riverkeeper's

3   members have been, are being, and will be adversely affected by the Port's CWA and NPDES

4   permit violations addressed herein and by the members' reasonable concerns related to the

5   effects of the violations and pollutant discharges. These injuries are fairly traceable to the

6   violations and redressable by this Court.

7

8       10.     Riverkeeper also has organizational standing to bring this action. Riverkeeper

9   actively engages in a variety of educational and advocacy efforts to improve water quality in the

10  Columbia River and its tributaries. The Port has failed to fulfill its monitoring, recordkeeping,

11  reporting, and planning requirements, among others, necessary for compliance with its NPDES

12  permits. As a result, Riverkeeper is deprived of information that supports its ability to serve its

13  members by disseminating information and taking appropriate action. Riverkeeper's efforts to

14  educate and advocate for greater environmental protection for the benefit of its members is

15  thereby obstructed. Thus, Riverkeeper's organizational interests have been adversely affected by

16  the Port's violations. These injuries are fairly traceable to the Port's violations and redressable by

17  this Court.

18

19      11.     Defendant Port of Vancouver U.S.A. is a port district formed under and governed

20  by Washington law, Wash. Rev. Code Title 53.

21

22      12.     The Port owns approximately four miles of riverfront property along the

23  Columbia River west of downtown Vancouver, Washington, that is depicted in Attachment A to

24  the Notice Letter attached hereto as Exhibit 1 (hereinafter "the Facility").

25

26      13.     The Port's Facility discharges pollutants, including stormwater associated with

27  industrial activity and the pollutants contained therein, to the Columbia River.

28

COMPLAINT - 4
No. 3:21-cv-05486

# IV.    LEGAL BACKGROUND

14.    Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants by any person unless authorized under certain provisions of the CWA, including an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. § 1342.

15.    The State of Washington has established a federally approved state NPDES program administered by Ecology. Wash. Rev. Code § 90.48.260; Wash. Admin. Code ch. 173-220. This program was approved by the Administrator of the EPA pursuant to section 402(b) of the CWA, 33 U.S.C. § 1342(b).

16.    Ecology has issued several iterations of the Industrial Stormwater General Permit ("General Permit") under section 402(a) of the CWA, 33 U.S.C. § 1342(a), the most recent of which was issued on November 20, 2019, became effective on January 1, 2020, and is set to expire on December 31, 2024 (the "2020 General Permit"). The previous iteration was issued on December 3, 2014, became effective on January 2, 2015, and expired on December 31, 2019 (the "2015 General Permit"). The iteration of the General Permit prior to the 2015 General Permit was issued by Ecology on October 21, 2009, became effective January 1, 2010, was modified on May 16 and July 1, 2012, and expired on January 1, 2015 (the "2010 General Permit"). The General Permit, in its various iterations since its first issuance in 1993, all of which contain comparable requirements, authorizes those that obtain coverage thereunder to discharge stormwater associated with industrial activity, a pollutant under the CWA, and other pollutants contained in the stormwater to waters of the United States subject to certain terms and conditions.

17.    The 2015 General Permit and the 2020 General Permit (collectively, "General Permits") impose terms and conditions, including discharge monitoring and sampling requirements, reporting and recordkeeping requirements, and restrictions on the quality of

COMPLAINT - 5
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

stormwater discharges. To reduce and eliminate pollutants in stormwater discharges, the General

Permits require, among other things, that permittees develop and implement a Stormwater

Pollution Prevention Plan ("SWPPP") that includes appropriate best management practices

("BMPs") and that applies all known and reasonable methods of pollution prevention, control,

and treatment ("AKART") to discharges. The specific terms and conditions of the General

Permits are described in detail in sections II–IX of the Notice Letter, attached hereto as <u>Exhibit 1</u>

at 3–18.

## V.    FACTS

18.    The Port was granted coverage for the Facility under the 2010 General Permit and

the 2015 General Permit for the duration of those permits' effectiveness under NPDES Permit

Number WAR000424. The Port was granted coverage under the 2020 General Permit on its

effective date of January 1, 2020 and maintains the same NPDES Permit Number WAR000424.

19.    The Port discharges stormwater associated with industrial activity and other

pollutants into the Columbia River via stormwater conveyance systems.

20.    The Port has violated the terms and conditions of the General Permits. The Port's

violations of the General Permits are set forth in sections II through VIII of the Notice Letter,

attached hereto as <u>Exhibit</u> 1 at 3–18, and are incorporated herein by this reference except to the

extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

In particular, and among the other violations described in the Notice Letter, the Port has violated

the General Permits by failing to monitor discharges, develop and implement a SWPPP with

adequate BMPs to control stormwater quality, timely complete adaptive management responses,

and timely submit complete and accurate reports.

21.    The General Permits require the Port to monitor stormwater discharges in a

manner that is representative of discharges from the Facility. The stormwater monitoring data

COMPLAINT - 6
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

described in Table 1, below, are the stormwater monitoring results that the Port submitted to Ecology on discharge monitoring reports ("DMRs") under the requirements of the General Permits. The Port has discharged stormwater containing levels of pollutants that exceed the benchmark values established by the General Permits, including on the days on which the Port collected samples with the results identified in bold in Table 1, below.

| TABLE 1: DMR Monitoring Data Reported by the Port | | | |
|---|---|---|---|
| Monitoring Period | Discharge Monitoring Point | Total Copper Benchmark: 14 µg/L | Total Zinc Benchmark: 117 µg/L |
| 1st Quarter 2015 | T2 | CA | CA |
| | T4 | **37.9** | 86.8 |
| 2nd Quarter 2015 | T2 | ND | ND |
| | T4 | **72** | 53 |
| 3rd Quarter 2015 | T2 | CA | CA |
| | T4 | **35** | 24 |
| 4th Quarter 2015 | T2 | CA | CA |
| | T4 | **41.4** | CA |
| 1st Quarter 2016 | T2 | CA | CA |
| | T4 | **40.7** | CA |
| 2nd Quarter 2016 | T2 | CA | CA |
| | T4 | **23.5** | CA |
| 3rd Quarter 2016 | T2 | ND | ND |
| | T4 | ND | ND |
| 4th Quarter 2016 | T2 | CA | CA |
| | T4 | **21** | CA |
| 1st Quarter 2017 | T2 | 3 | 14 |
| | T4 | **34** | CA |
| 2nd Quarter 2017 | T2 | **15.2** | **170** |
| | T4 | ND | ND |
| 3rd Quarter 2017 | T2 | 11 | 42 |
| | T4 | **30** | 27 |
| 4th Quarter 2017 | T2 | 10.7 | 100.5 |
| | T4 | **29.5** | 12 |
| 1st Quarter 2018 | T2 | 8.1 | 78 |
| | T4 | **19.95** | 24 |
| 2nd Quarter 2018 | T2 | ND | ND |
| | T4 | ND | ND |
| 3rd Quarter 2018 | T2 | ND | ND |
| | T4 | ND | ND |

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

| | | | |
|---|---|---|---|
| 4th Quarter 2018 | T2 | 12 | 85 |
| | T4 | **42.5** | 59 |
| 1st Quarter 2019 | T2 | 4.7 | 74.1 |
| | T4 | **20.1** | 44 |
| 2nd Quarter 2019 | T2 | 10.3 | **290** |
| | T4 | **23.5571** | 19.7 |
| 3rd Quarter 2019 | T2 | 5.5 | 62.7 |
| | T4 | **18.95** | 13.75 |
| 4th Quarter 2019 | T2 | ND | ND |
| | T4 | 8 | 12 |
| 1st Quarter 2020 | T2 | 11 | 107 |
| | T4 | 13.9333 | 36.3 |
| 2nd Quarter 2020 | T2 | 11.1 | **220** |
| | T4 | **21.65** | 89.55 |
| 3rd Quarter 2020 | T2 | **20** | **348** |
| | T4 | **22** | 18 |
| 4th Quarter 2020 | T2 | 7.6 | 114.075 |
| | T4 | **22.225** | 30.73 |
| 1st Quarter 2021 | T2B | **331** | **383** |
| | T2M | 6.9 | 106 |
| | T4 | **15.8** | 28 |

Monitoring results shown in **Bold** exceed the General Permits' benchmarks
"CA": DMR represented facility was at "consistent attainment"
"ND": DMR represented facility had no discharge during monitoring period

22.    The Port's exceedances of the benchmark values indicate that Port is failing to apply AKART to its discharges and/or is failing to implement an adequate SWPPP and BMPs. Upon information and belief, the Port is in violation of the General Permits by not developing and/or implementing a SWPPP that includes appropriate BMPs in accordance with the requirements of the General Permits, by not applying AKART to discharges, by not implementing BMPs necessary to prevent discharges from contributing to violations of water quality standards in the receiving waters, and by discharging in a manner that contributes to violations of water quality standards. These requirements, and the Port's violations thereof, are described in detail in sections II and III of the Notice Letter, attached hereto as Exhibit 1 at 3–8, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

23.     The Port has violated the discharge monitoring requirements of the General Permits. The Port has failed to collect, analyze, and report discharge samples during each calendar quarter as required by the General Permits. The Port failed to collect stormwater samples at any of its discharge points during the following quarterly monitoring periods: the third quarter of 2016 and the second and third quarters of 2018. The Port further violated these requirements by failing to collect stormwater discharges from its T4 monitoring point during the second quarter of 2017 and from its T2 monitoring point during the fourth quarter of 2019. The Port has also violated the General Permits' monitoring requirements failing to collect, analyze, and report discharge samples from discharge points that are not substantially identical to those points that the Port monitors. These requirements of the General Permits, and the Port's violations thereof, are described in detail in section IV.A of the Notice Letter, attached hereto as Exhibit 1 at 8–9, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

24.     The Port has further violated the General Permits' monitoring requirements by failing to analyze quarterly samples in the manner required, including by failing to analyze discharge samples for the parameters as identified in Table 2 below, which includes instances where the Port improperly claimed analysis was not required under the General Permits' consistent attainment provisions.

| TABLE 2: Pollutant Parameters Not Analyzed | | |
|---|---|---|
| **Monitoring Period** | **Monitoring Point** | **Parameters Not Analyzed** |
| Third Quarter 2016 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Fourth Quarter 2016 | T2 | Turbidity, pH, Total Copper, Total Zinc |
| | T4 | Turbidity, pH, Total Zinc |

COMPLAINT - 9
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

| First Quarter 2017 | T4 | Turbidity, pH, Total Zinc |
|---|---|---|
| Second Quarter 2017 | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Second Quarter 2018 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Third Quarter 2018 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Fourth Quarter 2019 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |

These requirements, and the Port's violations thereof, are described in section IV.B of the Notice Letter, attached hereto as Exhibit 1 at 9–10, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

25.     The Port has violated the visual monitoring requirements of the General Permits. For example, upon information and belief, the Port has failed to conduct visual monitoring at each location where stormwater associated with industrial activity is discharged and the Port has failed to prepare visual monitoring reports/checklists that include all required information, including identification of all locations inspected. These requirements, and the Port's violations thereof, are described in section IV.C of the Notice Letter, attached hereto as Exhibit 1 at 10, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

26.     The Port has violated the General Permit's prohibition on illicit discharges. Operations at the Facility include the loading of bulk commodities, including copper ore, urea, and grain, to vessels docked at the Facility, the unloading of these materials from vessels to upland portions of the Facility, and the cleaning of structures and equipment used in loading and

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

unloading operations. Upon information and belief, these activities result in illicit discharges of the bulk commodities in violation of the General Permits. These requirements, and the Port's violations thereof, are described in section V of the Notice Letter, attached hereto as Exhibit 1 at 10–11, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

27.     Further, these illicit discharges violate section 301(a) of the CWA because they are not authorized by the General Permits or another NPDES permit. These discharges are made via point sources, including the structures, equipment, and devises used for loading and unloading bulk commodities. These discharges are made to a water of the United States, as the Columbia River is a navigable water body at the locations of the discharges. The bulk commodities discharged by the Port constitute "pollutants" under the CWA when discharged to navigable waters. Upon information and belief, the Port has knowledge of these discharges and the ability, through its lease agreements with its tenants and its other authorities as the owner of the Facility, to prevent and/or control these discharges. The Port's violations of section 301(a) of the CWA are described in section V of the Notice Letter, attached hereto as Exhibit 1 at 10–11, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

28.     The Port has not conducted and/or completed the corrective action responses as required by the General Permits. These requirements of the General Permits, and Port's violations thereof, are described in section VI of the Notice Letter, attached hereto as Exhibit 1 at 11–17, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

29.     The General Permits require a permittee to undertake a Level 1 corrective action whenever contamination in the permittee's stormwater discharge exceeds a benchmark level. A

COMPLAINT - 11
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

Level 1 corrective action comprises reviewing the SWPPP to ensure permit compliance; revising the SWPPP to include additional operational source control BMPs with the goal of achieving the applicable benchmark values in future discharges; signing and certifying the revised SWPPP; summarizing the Level 1 corrective action in the annual report; and fully implementing the revised SWPPP as soon as possible, but no later than the discharge monitoring report due date for the quarter the benchmark was exceeded. The 2020 General Permit requires the implementation of any Level 1 corrective actions triggered under the 2015 General Permit.

30.    The Port triggered a Level 1 corrective action for each benchmark exceedance identified in Table 1, above. The Port has violated the requirements of the General Permits by failing to conduct a Level 1 corrective action in accordance with permit conditions each time since and including the first quarter of 2016 that the Port's quarterly stormwater sampling results were greater than a benchmark for zinc or copper, including the benchmark excursions listed in Table 1, above. These corrective action requirements, and the Port's violations thereof, are described in section VI.A of the Notice Letter, attached hereto as Exhibit 1 at 11–12, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

31.    The General Permits require a permittee to undertake a Level 2 corrective action whenever its discharges exceed a particular benchmark value for any two quarters during a calendar year. A Level 2 corrective action comprises reviewing the SWPPP to ensure permit compliance; revising the SWPPP to include additional structural source control BMPs with the goal of achieving the benchmark in future discharges; signing and certifying the revised SWPPP; summarizing the Level 2 corrective action (planned or taken) in the annual report; and fully implementing the revised SWPPP by August 31 of the following year, including installation of

COMPLAINT - 12
No. 3:21-cv-05486

necessary structural source control BMPs. The 2020 General Permit requires the implementation of any Level 2 correction actions triggered under the 2015 General Permit.

32.     The Port triggered Level 2 corrective action requirements for pollutant parameters as indicated by the benchmark exceedances in Table 1, above. The Port violated the requirements of the General Permits described above by failing to conduct Level 2 corrective actions in the manner required each time the Port's stormwater sampling results triggered the requirements of a Level 2 corrective action under the provisions of the General Permits since and including 2015. These corrective action requirements, and the Port's violations thereof, are described in section VI.B of the Notice Letter, attached hereto as Exhibit 1 at 12–13, and are incorporated herein by this reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

33.     The General Permits requires a permittee to undertake a Level 3 corrective action whenever the permittee's discharges exceed a benchmark value for any three quarters during a calendar year. This is the most comprehensive adaptive management provision under the General Permits. A Level 3 corrective action comprises reviewing the SWPPP to ensure permit compliance; revising the SWPPP to include additional treatment BMPs with the goal of achieving benchmarks in future discharges (and additional operational and/or structural source control BMPs if necessary for proper function and maintenance of the treatment BMPs); signing and certifying the revised SWPPP; summarizing the Level 3 corrective action in the annual report, including information on how monitoring, assessment, or evaluation was (or will be) used to determine whether existing treatment BMPs will be modified/enhanced or if new/additional treatment BMPs will be installed; and fully implementing the revised SWPPP as soon as practicable and no later than September 30 of the following year, including installation of necessary treatment BMPs. A specified professional must review the revised SWPPP, sign the

COMPLAINT - 13
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

SWPPP certification form, and certified that it is reasonably expected to meet benchmarks upon implementation. Before installing any BMPs that require the site-specific design or sizing of structures, equipment, or processes to collect, convey, treat, reclaim, or dispose of industrial stormwater, the permittee must submit an engineering report, certified by a licensed professional engineer, to Ecology for review. The report must contain: (1) a brief summary of the treatment alternatives considered and why the proposed option was selected, including cost estimates of ongoing operation and maintenance and disposal of any spent media; (2) the basic design data, including characterization of stormwater influent and sizing calculations for the treatment units; (3) a description of the treatment process and operation, including a flow diagram; (4) the amount and kind of chemicals used in the treatment process, if any; (5) the expected results from the treatment process including the predicted stormwater discharge characteristics; and (6) a statement, expressing sound engineering justification—through the use of pilot plant data, results from similar installations, and/or scientific evidence—that the proposed treatment is reasonably expected to meet the permit benchmarks. The engineering report must be submitted no later than the May 15 prior to the Level 3 corrective action deadline. The permittee must also submit an operations and maintenance manual to Ecology at least 30 days after construction/installation is complete.

34.     The Port triggered Level 3 corrective action requirements for pollutant parameters as indicated by the benchmark exceedances in Table 1, above. The Port violated the requirements of the General Permits described above by failing to conduct Level 3 corrective actions in the manner required each time the Port's stormwater sampling results triggered the requirements of a Level 3 corrective action under the provisions of the General Permits since and including 2015. These corrective action requirements, and the Port's violations thereof, are described in section VI.C.1 of the Notice Letter, attached hereto as Exhibit 1 at 13–15, and are incorporated herein by

COMPLAINT - 14
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

1    this reference except to the extent the Notice Letter alleges liability under the CWA for violation

2    days before May 8, 2016.

3        35.    The 2010 General Permit prescribed Level 3 corrective action requirements

4    substantially similar to those contained in the 2015 General Permit and the 2020 General Permit.

5    The Port triggered Level 3 corrective action requirements for total zinc and total copper with its

6    stormwater discharge monitoring results from 2010. Ecology extended the implementation

7    deadline a total of six years via Ecology Order 8719 and Ecology Amended Order 10920; from

8    September 30, 2011 to September 30, 2017. The Port violated the requirements of the 2010

9    General Permit and the Ecology orders by failing to fully implement the Level 3 corrective

10   actions triggered in 2010 for total zinc and total copper. These corrective action requirements,

11   and Port's violations thereof, are described in section VI.C.2 of the Notice Letter, attached hereto

12   as Exhibit 1 at 15–17, and are incorporated herein by this reference except to the extent the

13   Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

14       36.    Upon information and belief, the Port has failed to comply with recording and

15   record keeping requirements of the General Permits. These requirements, and the Port's

16   violations thereof, are described in section VII of the Notice Letter, attached hereto as Exhibit 1

17   at 17, and are incorporated herein by this reference except to the extent the Notice Letter alleges

18   liability under the CWA for violation days before May 8, 2016.

19       37.    The General Permits require a permittee to take certain reporting and other

20   responsive actions each time the permittee violates any terms and conditions of the General

21   Permits in a manner that may endanger human health or the environment. The Port has

22   repeatedly violated these requirements, including each and every time during the last five years

23   and sixty days that the Port: failed to comply with corrective action requirements and/or

24   discharged stormwater with concentrations of pollutants that are likely to cause or contribute to

COMPLAINT - 15
No. 3:21-cv-05486

violations of water quality standards. These requirements, and the Port's violations thereof, are described in section VIII of the Notice Letter, attached hereto as Exhibit 1 at 17–18, and are incorporated herein by reference except to the extent the Notice Letter alleges liability under the CWA for violation days before May 8, 2016.

38.     The violations alleged herein are ongoing because they are continuing and/or are reasonably likely to recur. For example, the Port's failure to timely and fully complete corrective actions are continuing violations and recurring. Notably, the Port triggered the requirements of a Level 3 corrective action for total copper with its discharge monitoring results for 2020, but has failed to undertake required actions; e.g., the Port's 2020 annual report fails to identify any additional stormwater treatment measures being implemented as part of a Level 3 corrective action and the Port failed to summit the required engineering report by May 15, 2021 for the Level 3 corrective action.

39.     Discharges from the Port's Facility contribute to the polluted conditions of the waters of the United States, including the Columbia River. Discharges from the Port's Facility contribute to the ecological impacts that result from the polluted condition of these waters and to Riverkeeper's and its members' injuries resulting therefrom.

40.     The vicinity of the Facility's discharges are used by the citizens of Washington and Oregon and visitors, as well as at least one of Riverkeeper's members, for activities including swimming, boating, biking, fishing and nature watching. Riverkeeper's member(s) also derive(s) aesthetic benefits from the receiving waters. Riverkeeper's and its members' enjoyment of these activities and waters is diminished by the polluted state of the receiving waters and by the Port's contributions to such a polluted state.

41.     A significant penalty should be imposed against the Port under the penalty factors set forth in section 309(d) of the CWA, 33 U.S.C. § 1319(d).

COMPLAINT - 16
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

42. The Port's violations were avoidable had Port been diligent in overseeing the Facility's operations and maintenance.

43. The Port has benefited economically as a consequence of its violations and its failure to implement improvements at the facility.

44. In accordance with section 505(c)(3) of the CWA, 33 U.S.C. § 1365(c)(3), and 40 C.F.R. § 135.4, Riverkeeper will mail either a filed, date-stamped copy of this complaint or a conformed copy of this complaint after it is filed to the Administrator of the EPA, the Regional Administrator for Region 10 of the EPA, and the Attorney General of the United States.

## VI.     FIRST CAUSE OF ACTION

45. The preceding paragraphs are incorporated herein by this reference.

46. The Port's violations of the General Permits and the 2010 General Permit described herein and in the Notice Letter constitute violations of an "effluent standard or limitation" as defined by section 505(f) of the CWA, 33 U.S.C. § 1365(f).

47. Upon information and belief, these violations committed by the Port are continuing or are reasonably likely to continue to recur. Any and all additional violations of the General Permits that occur after the date of Riverkeeper's Notice Letter, but before a final decision in this action, should be considered continuing violations subject to this complaint.

48. Without the imposition of appropriate civil penalties and the issuance of an injunction, the Port is likely to continue to violate the General Permits to the further injury of Riverkeeper, its member(s), and the public.

## VII.     SECOND CAUSE OF ACTION

49. The preceding paragraphs are incorporated herein by this reference.

50. The Port's unauthorized discharges of pollutants to waters of the United States in violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a), described herein and in the Notice

COMPLAINT - 17
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

Letter constitute violations of an "effluent standard or limitation" as defined by section 505(f) of the CWA, 33 U.S.C. § 1365(f).

51.     Upon information and belief, these violations committed by the Port are continuing or are reasonably likely to continue to recur. Any and all additional unauthorized discharges of pollutants in violation of the section 301(a) of the CWA, 33 U.S.C. § 1311(a), that occur after the date of Riverkeeper's Notice Letter, but before a final decision in this action, should be considered continuing violations subject to this complaint.

52.     Without the imposition of appropriate civil penalties and the issuance of an injunction, the Port's unauthorized discharges of pollutants in violation of the section 301(a) of the CWA, 33 U.S.C. § 1311(a), are likely to continue to the further injury of Riverkeeper, its member(s), and the public.

## VIII.   RELIEF REQUESTED

Wherefore, Riverkeeper respectfully requests that this Court grant the following relief:

A.      Issue a declaratory judgment that the Port violated, and continues to be in violation of, the General Permits and the 2010 General Permit;

B.      Issue a declaratory judgment that the Port violated, and continues to be in violation of, section 301(a) of the CWA, 33 U.S.C. § 1311(a);

C.      Enjoin the Port from operating the Facility in a manner that results in further violations of the General Permits;

D.      Enjoin the Port from operating the Facility in a manner that results in further violations of section 301(a) of the CWA, 33 U.S.C. § 1311(a);

E.      Order the Port to immediately implement a SWPPP that complies with the General Permits;

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

1

2    F.    Order the Port to provide Riverkeeper, for a period beginning on the date of the

3    Court's Order and running for one year after the Port achieves compliance with all of the

4    conditions of the General Permits, with copies of all reports and other documents that the Port

5    submits to or receives from Ecology and/or EPA regarding the Port's coverage under the General

6    Permits, at the same time those documents are submitted to or received from Ecology and/or

7    EPA;

8    G.    Order the Port to take specific actions to remediate the environmental harm

9    caused by its violations;

10   H.    Grant such other preliminary and/or permanent injunctive relief as Riverkeeper

11   may from time to time request during the pendency of this case;

12   I.    Order the Port to pay civil penalties as authorized by sections 309(d) and 505(a)

13   of the CWA, 33 U.S.C. §§ 1319(d) and 1365(a), and 40 C.F.R. § 19.

14   J.    Award Riverkeeper its litigation expenses, including reasonable attorneys' and

15   expert witness fees, as authorized by section 505(d) of the CWA, 33 U.S.C. § 1365(d), or as

16   otherwise authorized by law; and

17   K.    Award such other relief as this Court deems appropriate.

18   RESPECTFULLY SUBMITTED this 7th day of July, 2021.

19

20                    [signatures on following page]

21

22

23

24

25

26

27

28

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

KAMPMEIER & KNUTSEN, PLLC

By:  s/ Brian A. Knutsen
Brian A. Knutsen, WSBA No. 38806
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
Tel: (503) 841-6515
Email: brian@kampmeierknutsen.com

By:  s/ Jessica Durney
Jessica Durney, WSBA No. 57923
811 First Avenue, Suite 468
Seattle, Washington 98104
Tel.: (206) 739-5184
Email: jessica@kampmeierknutsen.com

COLUMBIA RIVERKEEPER

Simone Anter, WSBA No. 52716
407 Portway Avenue, Suite 301
Hood River, Oregon 97031
Tel.: (541) 399-5312
Email: simone@columbiariverkeeper.org

*Attorneys for Plaintiff Columbia Riverkeeper*

COMPLAINT - 20
No. 3:21-cv-05486

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Start Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

# EXHIBIT 1

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

BRIAN A. KNUTSEN
Licensed in Oregon & Washington
503.841.6515
brian@kampmeierknutsen.com

November 5, 2020

**Via CERTIFIED MAIL – Return Receipt Requested**

Julianna Marler, CEO
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Kent Cash, Chief Operations Officer
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Patty Boyden, Director of Environmental Services
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Don Orange, District One Commissioner
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Eric LaBrant, District Two Commissioner
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Jack Burkman, District Three Commissioner
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Re:     **NOTICE OF INTENT TO SUE UNDER THE CLEAN WATER ACT AND
        REQUEST FOR COPY OF STORMWATER POLLUTION PREVENTION PLAN**

Dear Commissioners, Ms. Marler, Mr. Cash, and Ms. Boyden:

This letter is submitted on behalf of Columbia Riverkeeper, 407 Portway Ave, Suite 301, Hood River, OR 97031. This letter provides you with sixty days notice of Columbia Riverkeeper's intent to file a citizen suit against the Port of Vancouver USA (the "Port") under section 505 of the Clean Water Act ("CWA"), 33 U.S.C § 1365, for the violations described below. This letter also requests a copy of the complete and current stormwater pollution prevention plan ("SWPPP") required by the Port's National Pollution Discharge Elimination System ("NPDES") permit.

The Port was granted coverage under the previous iteration of Washington's Industrial Stormwater General Permit ("ISGP") issued by the Washington Department of Ecology ("Ecology") on December 3, 2014 and effective January 2, 2015 under NPDES permit number WAR000424 (the "2015 Permit"). The 2015 Permit expired on December 31, 2019 and was replaced with the subsequent iteration of the ISGP, effective January 1, 2020 and set to expire on December 31, 2024. The Port applied for renewal within 180 days of the 2015 Permit's expiration. Ecology granted the Port coverage under the 2020 Permit, maintaining the same permit number, WAR000424 (the "2020 Permit").

The Port has violated and continues to violate the terms and conditions of the 2015 Permit and 2020 Permit (collectively, the "Permits") with respect to the operation of, and discharges of stormwater and pollutants from, its facility located at or near 3103 NW Lower River Road Vancouver, WA 98660 (the "facility"), where it operates as a public port district for various properties, including warehouses, industrial and commercial buildings, marine facilities, grain terminals, ship load-out facilities (berths), industrial wastewater collection and treatment facilities, and some undeveloped land. The facility subject to this notice includes all contiguous or adjacent properties owned and/or operated by the Port, regardless of whether a specific area discharges some stormwater to a pretreatment and/or sanity sewer system, and is generally depicted in the figure attached hereto as Attachment A. The Port has also violated and continues to violate administrative orders issued by Ecology pertaining to the Port's compliance with the ISGP. The Port further has violated and continues to violate section 301(a) of the CWA, 33 U.S.C. § 1311(a), by discharging pollutants from point sources to waters of the United States without the authorization of an NPDES permit.

I.      **COLUMBIA RIVERKEEPER'S COMMITMENT TO PROTECTING A FISHABLE AND SWIMMABLE COLUMBIA RIVER.**

Columbia Riverkeeper's mission is to restore and protect the water quality of the Columbia River and all life connected to it, from the headwaters to the Pacific Ocean. Columbia Riverkeeper is a non-profit organization with members who live, recreate, and work throughout the Columbia River basin, including near and downstream of the Port.

Threats facing the Columbia River are severe by any measure. *See Columbia River Basin State of the River Report for Toxics,* Environmental Protection Agency, Region 10 (January 2009) (available online at: https://www.epa.gov/sites/production/files/documents/columbia_state_of_the_river_report_jan2009.pdf). In fact, the vast majority of rivers and streams in Washington fail to meet basic state water quality standards for pollutants such as toxics and temperature. *See* State of Washington 303(d) List (available online at: https://ecology.wa.gov/Water-Shorelines/Water-quality/Water-improvement/Assessment-of-state-waters-303d). Water quality standards are designed to protect designated uses, including aquatic life, fishing, swimming, and drinking water.

Stormwater runoff is "one of the great challenges of water pollution control" and "is a principal contributor to water quality impairment of waterbodies nationwide." *See Urban Storm Management in the United States,* National Research Council (Oct. 15, 2008) (available online at: http://www.epa.gov/npdes/pubs/nrc_stormwaterreport.pdf). When rain sends runoff across streets, construction projects, and industrial facilities, the water picks up contaminants that are drained into waterways such as the Columbia River and its tributaries. To address this leading cause of water quality impairment, Columbia Riverkeeper invests significant time and resources in reducing pollutant loads from industrial, municipal, and construction stormwater sources.

This Notice of Intent to Sue the Port is part of Columbia Riverkeeper's effort to improve water quality in the Columbia River Basin for purposes including swimming, habitat quality, and subsistence, recreational, and commercial fishing. Columbia Riverkeeper has serious concerns about the impacts of the Port's operations and industrial stormwater discharges on the Columbia

2

River. As discussed below, the Port has repeatedly discharged contaminates in excess of the Permits' benchmarks while failing to implement the required corrective actions, failed to representatively sample its discharges, and failed to adopt and implement a SWPPP that satisfies the requirements of Washington's ISGP. The Port's operations and stormwater discharges degrade water quality in the Columbia River Basin and may contribute to conditions that place the health of those who use the Columbia River at risk.

## II.      VIOLATIONS OF STANDARDS.

### A.      Violation of Water Quality Standards.

Condition S10.A of the Permits prohibits discharges that cause or contribute to violations of water quality standards. Water quality standards are the foundation of the CWA's and Washington's efforts to protect clean water. Water quality standards represent the U.S. Environmental Protection Agency's ("EPA") and Ecology's determination, based on scientific studies, of the thresholds at which pollution starts to cause significant adverse impacts on fish and other beneficial uses.

A discharger must comply with both narrative and numeric water quality standards. WAC 173-201A-010; *see also* WAC 173-201A-510 ("No waste discharge permit can be issued that causes or contributes to a violation of water quality criteria . . . ."). Narrative water quality standards provide legal mandates that supplement the numeric standards. Furthermore, narrative water quality standards apply with equal force, even when Ecology has established numeric water quality standards. Specifically, Condition S10.A of the Permits requires that the Port neither cause nor contribute to violations of Washington's water quality standards.

The Port discharges stormwater into the Columbia River directly and via ditches, pipes, ponds, wharf openings, and other discrete conveyances and features of the facility's stormwater system. The Port discharges stormwater that contains elevated levels copper and zinc. *See* Table 1, below. These discharges cause and/or contribute to violations of water quality standards for copper and zinc, and aesthetic criteria in the Columbia River and have occurred each and every day during the last five years on which there was 0.1 inch or more of precipitation, and continue to occur. These water quality standards include those set forth in WAC 173-201A-200; -240; and -260(2).

| TABLE 1: DMR Monitoring Data Reported by the Port | | | |
|---|---|---|---|
| **Monitoring Period** | **Discharge Monitoring Point** | **Total Copper**<br>Benchmark: 14 µg/L | **Total Zinc**<br>Benchmark: 117 µg/L |
| 1st Quarter 2015 | T2 | CA | CA |
| | T4 | **37.9** | 86.8 |
| 2nd Quarter 2015 | T2 | ND | ND |
| | T4 | **72** | 53 |
| 3rd Quarter 2015 | T2 | CA | CA |
| | T4 | **35** | 24 |
| 4th Quarter 2015 | T2 | CA | CA |

3

| | T4 | **41.4** | CA |
|---|---|---|---|
| 1st Quarter 2016 | T2 | CA | CA |
| | T4 | **40.7** | CA |
| 2nd Quarter 2016 | T2 | CA | CA |
| | T4 | **23.5** | CA |
| 3rd Quarter 2016 | T2 | ND | ND |
| | T4 | ND | ND |
| 4th Quarter 2016 | T2 | CA | CA |
| | T4 | **21** | CA |
| 1st Quarter 2017 | T2 | 3 | 14 |
| | T4 | **34** | CA |
| 2nd Quarter 2017 | T2 | **15.2** | **170** |
| | T4 | ND | ND |
| 3rd Quarter 2017 | T2 | 11 | 42 |
| | T4 | **30** | 27 |
| 4th Quarter 2017 | T2 | 10.7 | 100.5 |
| | T4 | **29.5** | 12 |
| 1st Quarter 2018 | T2 | 8.1 | 78 |
| | T4 | **19.95** | 24 |
| 2nd Quarter 2018 | T2 | ND | ND |
| | T4 | ND | ND |
| 3rd Quarter 2018 | T2 | ND | ND |
| | T4 | ND | ND |
| 4th Quarter 2018 | T2 | 12 | 85 |
| | T4 | **42.5** | 59 |
| 1st Quarter 2019 | T2 | 4.7 | 74.1 |
| | T4 | **20.1** | 44 |
| 2nd Quarter 2019 | T2 | 10.3 | **290** |
| | T4 | **23.5571** | 19.7 |
| 3rd Quarter 2019 | T2 | 5.5 | 62.7 |
| | T4 | **18.95** | 13.75 |
| 4th Quarter 2019 | T2 | ND | ND |
| | T4 | 8 | 12 |
| 1st Quarter 2020 | T2 | 11 | 107 |
| | T4 | 13.9333 | 36.3 |
| 2nd Quarter 2020 | T2 | 11.1 | **220** |
| | T4 | **21.65** | 89.55 |

Monitoring results shown in **Bold** exceed the Permits' benchmarks
CA: DMR represents that the facility was at consistent attainment
ND: DMR represents that there was no discharge from the facility

### B.    Violations of Permitting Standards.

Condition S10.C of the Permits requires the Port to apply all known and reasonable methods of pollution prevention, control, and treatment ("AKART") to all discharges, including

4

preparing and implementing an adequate SWPPP and best management practices ("BMPs"). The Port has violated and continues to violate this condition by failing to apply AKART to its discharges by, among other things, failing to implement an adequate SWPPP and BMPs as evidenced by the elevated levels of pollutants in its discharge indicated in Table 1 above and as described below. These violations have occurred on each and every day during the last 5 years and continue to occur every day.

## III.    STORMWATER POLLUTION PREVENTION PLAN VIOLATIONS.

Columbia Riverkeeper hereby provides notice, based upon information and belief, that the Port has not developed and implemented a SWPPP that complies with the requirements of the Permits. The extensive violations of the Permits and the ongoing discharges of polluted industrial stormwater documented in the publicly available records indicate that the Port is not fully implementing a SWPPP that includes adequate BMPs and that otherwise includes all of the required SWPPP components. The violations of the Permits' SWPPP provisions described below have occurred each and every day over the last five years and continue to occur each day.

Condition S3.A of the Permits requires the Port to develop and implement a SWPPP as specified in the Permits and to update the SWPPP as necessary to maintain compliance with the Permits. Conditions S3.A.2 of the 2015 Permit and S3.A.1 of the 2020 Permit require the SWPPP to specify the BMPs necessary to provide AKART and ensure that discharges do not cause or contribute to violations of water quality standards. On information and belief, the Port violated these requirements of the Permits by failing to prepare a SWPPP that includes AKART BMPs, BMPs necessary to meet state water quality standards, and that is otherwise fully consistent with the Permits, by failing to fully implement a SWPPP, and by failing to update a SWPPP as necessary. Condition S3.A.3.c of the 2020 Permit requires the Port's SWPPP to be updated to be consistent with the 2020 Permit by January 30, 2020. The Port has violated Condition S3.A.3.c by failing to timely update and certify the facility's SWPPP by January 30, 2020.

On information and belief, the SWPPP fails to satisfy the requirements of Condition S3 of the Permits because it does not adequately describe the necessary BMPs. Condition S3.B.4 of the Permits requires that the SWPPP include a description of the BMPs that are necessary for the facility to eliminate or reduce the potential to contaminate stormwater. Condition S3.B.4 of the Permits requires that the SWPPP detail how and where the selected BMPs will be implemented. Condition S3.A.3 of the 2015 Permit and Condition S3.A.2 of the 2020 Permit require that the SWPPP include BMPs consistent with approved stormwater technical manuals (or document how stormwater BMPs included in the SWPPP are demonstrably equivalent to the practices contained in the approved stormwater technical manuals, including the proper selection, implementation, and maintenance of all applicable and appropriate BMPs). The Port's SWPPP does not comply with these requirements because it does not adequately describe and explain in detail the BMPs selected, does not include BMPs consistent with approved stormwater technical manuals, and/or does not include BMPs that are demonstrably equivalent to approved BMPs with documentation of BMP adequacy.

5

The Port's SWPPP fails to satisfy the requirements of Condition S3.B.1 of the Permits because it fails to include a site map that includes all required components. The SWPPP does not comply with Condition S3.B.1 of the 2015 Permit because it does not include a site map that identifies: the scale or include relevant distances between significant structures and drainage systems; significant features; the stormwater drainage and discharge structures; the stormwater drainage areas for each stormwater discharge point off-site with a unique identifying number for each discharge point; each sampling location with a unique identifying number; paved areas and buildings; areas of pollutant contact associated with specific industrial activities; conditionally approved non-stormwater discharges; surface water locations; areas of existing and potential soil erosion; vehicle maintenance areas; and lands and waters adjacent to the site that may be helpful in identifying discharge points or drainage routes. The SWPPP does not comply with Condition S3.B.1 of the 2020 Permit because it does not include a site map that identifies: the scale or includes relative distances between significant structures and drainage systems; size of the property in acres; location and extent of all buildings, structures and all impervious surfaces; direction of the stormwater flow; locations of all structural source control BMPs and all receiving water in the immediate vicinity of the facility; conditionally approved non-stormwater discharges; areas of existing and potential soil erosion that could result in the discharge of a significant amount of turbidity, sediment, or other pollutants; locations of all stormwater conveyances including ditches, pipes, catch basins, vaults, ponds, swales, etc.; locations of actual and potential pollutant sources; locations of all stormwater monitoring points; stormwater drainage areas for each stormwater discharge point off site (including discharges to groundwater); locations of stormwater inlets and outfalls with a unique identification number for each sampling point and discharge point, indicating any that are identified as substantially identical, and identify, by name, any other party other than The Port that owns any stormwater drainage or discharge structures; combined sewers or MS4s and where stormwater discharges to them; locations of fueling and vehicle maintenance areas; and locations and sources of run-on to the site from adjacent properties that may contain pollutants.

The Port's SWPPP fails to satisfy the requirements of Condition S3.B.2 of the Permits because it fails to include a facility assessment that includes: a description of the facility; an inventory of facility activities and equipment that contribute to or have the potential to contribute any pollutants to stormwater; and an inventory of materials that contribute to or have the potential to contribute pollutants to stormwater.

The SWPPP does not comply with Condition S3.B.2.a of the Permits because it does not include a facility description that describes: the industrial activities conducted at the site; the general layout of the facility including buildings and storage of raw materials, the flow of goods and materials through the facility; and the regular business hours, and the seasonal variations in business hours or industrial activities.

The Port's SWPPP fails to comply with Condition S3.B.2.b of the Permits because it does not include an inventory of industrial activities that identifies all areas associated with industrial activities that have been or may potentially be sources of pollutants. The SWPPP does not identify all areas associated with loading and unloading or dry bulk materials or liquids; outdoor storage of materials or products; outdoor manufacturing and processing; onsite dust or particulate generating processes; on-site waste treatment, storage, or disposal; vehicle and

equipment fueling, maintenance, and/or cleaning; roofs or other surfaces exposed to air emissions from a manufacturing building or a process area; and roofs or other surfaces composed of materials that may be mobilized by stormwater, as required by these permit conditions.

The Port's SWPPP does not comply with Condition S3.B.2.c of the Permits because it does not include an adequate inventory of materials. The SWPPP does not include: an inventory of materials that lists the types of materials handled at the site that potentially may be exposed to precipitation or runoff and that could result in stormwater pollution; a short narrative for each material describing the potential for pollutants to be present in stormwater discharge that is updated when data becomes available to verify the presence or absence of pollutants; or a narrative description of any potential sources of pollutants from past activities, materials, and spills that were previously handled, treated, stored, or disposed of in a manner to allow ongoing exposure to stormwater, as required. The SWPPP also does not include the method and location of on-site storage or disposal of such materials and a list of significant spills and significant leaks of toxic or hazardous pollutants, as the Permits require.

The Port's SWPPP does not comply with Condition S3.B.3 of the Permits because it does not identify specific individuals by name or title whose responsibilities include SWPPP development, implementation, maintenance, and modification.

Condition S3.B.4 of the Permits requires that permittees include in their SWPPPs, and implement, certain mandatory BMPs unless site conditions render the BMP unnecessary, infeasible, or an alternative and equally effective BMP is provided. The Port is in violation of these requirements because it has failed to include in its SWPPP, and implement, the mandatory BMPs required by the Permits, as detailed below.

The Port's SWPPP does not comply with Condition S3.B.4.b.i of the Permits because it does not include required operational source control BMPs in the following categories: good housekeeping (including definition of ongoing maintenance and cleanup of areas that may contribute pollutants to stormwater discharges, and a schedule/frequency for each housekeeping task); preventive maintenance (including BMPs to inspect and maintain stormwater drainage and treatment facilities, source controls, treatment systems, and plant equipment and systems, and the schedule/frequency for each task); spill prevention and emergency cleanup plan (including BMPs for preventing spills that can contaminate stormwater; for material handling procedures; storage requirements; cleanup equipment and procedures; and spill logs); employee training (including an overview of what is in the SWPPP, how employees make a difference in complying with the SWPPP, spill response procedures, good housekeeping, maintenance requirements, material management practices, how training will be conducted, the frequency/schedule of training, and a log of the dates on which specific employees received training); and inspections and recordkeeping (including documentation of procedures to ensure compliance with permit requirements for inspections and recordkeeping, including identification of personnel who conduct inspections, provision of a tracking or follow-up procedure to ensure that a report is prepared and appropriate action taken in response to visual monitoring, definition of how the Port will comply with signature and record retention requirements, certification of compliance with the SWPPP and Permit, and all inspection reports completed by the Port).

The Port's SWPPP does not comply with Condition S3.B.4.b.i.7 of the Permits because it does not include measures to identify and eliminate the discharge of process wastewater, domestic wastewater, noncontact cooling water, and other illicit discharges.

The Port's SWPPP does not comply with Condition S3.B.4.b.ii of the Permits because it does not include required structural source control BMPs to minimize the exposure of manufacturing, processing, and material storage areas to rain, snow, snowmelt, and runoff. The Port's SWPPP does not comply with Condition S3.B.4.b.iii of the Permits because it does not include treatment BMPs as required.

The Port's SWPPP fails to comply with Condition S3.B.4.b.v of the Permits because it does not include BMPs to prevent the erosion of soils or other earthen materials and prevent off-site sedimentation and violations of water quality standards.

The Port's SWPPP fails to satisfy the requirements of Condition S3.B.5 of the Permits because it fails to include an adequate stormwater sampling plan. The SWPPP does not include a sampling plan that: identifies points of discharge to surface waters, storm sewers, or discrete ground water infiltration locations; documents why any discharge point is not sampled; identifies each sampling point by its unique identifying number; identifies staff responsible for conducting stormwater sampling; specifies procedures for sample collection and handling; specifies procedures for sending samples to the a laboratory; identifies parameters for analysis, holding times and preservatives, laboratory quantization levels, and analytical methods; or specifies the procedure for submitting the results to Ecology.

## IV.     MONITORING AND REPORTING VIOLATIONS.

### A.     Failure to Collect Quarterly Discharge Samples.

Condition S4.B of the Permits require the Port to sample its stormwater discharge once during every calendar quarter. Conditions S3.B.5.b and S4.B.2.c of the 2015 Permit and Conditions S3.B.5.b and S4.B.3 of the 2020 Permit require the Port to collect stormwater samples at each distinct point of discharge offsite, except for substantially identical outfalls, in which case only one of the substantially identical outfalls must be sampled. These conditions set forth sample collection criteria, but require the collection of a sample even if the criteria cannot be met. The Port has violated these permit conditions each and every time it has failed to collect stormwater samples in compliance with the requirements of the Permits, including but not limited to the instances described below. Each failure to collect a sample of a required pollutant is a separate violation of the CWA.

The Port violated these requirements by failing to collect stormwater discharge samples at any of its discharge points during the third quarter of 2016 and the second and third quarters of 2018. The Port further violated these requirements by failing to collect stormwater discharges from its T4 monitoring point during the second quarter of 2017 and from its T2 monitoring point during the fourth quarter of 2019.

The Port also violated these conditions because the facility discharges from district points of discharge that are not monitored, including outfalls T2A, T2B, and T2C, and that are not substantially identical to the outfalls monitored by the Port. For example, T2A, T2B and T2C are not substantially identical to the monitored outfall for Terminal 2—outfall T2M—because the monitored outfall receives treatment in the form of a biofiltration system, while the unmonitored outfalls do not receive any treatment. These violations have occurred and continue to occur each and every quarter during the last five years that the Port was and is required to sample its stormwater discharges, including the quarters in which it collected stormwater discharge samples from some, but not all, points of discharge. These violations will continue until the Port commences monitoring all points of discharge that are not substantially identical.

### B.   Failure to Analyze Quarterly Discharge Samples for Pollutant Parameters.

Conditions S5.A and S5.B of the Permits require the Port to analyze all quarterly stormwater samples for turbidity, pH, oil sheen, total copper, total zinc, and petroleum hydrocarbons. Under the "consistent attainment" provisions of Condition S4.B.6 of the 2015 Permit, sample analysis for a parameter (other than oil sheen) may be discontinued for a period of three years following eight consecutive quarters where samples complied with the applicable benchmark value for that parameter. Under the "consistent attainment" provisions of Condition S4.B.7 of the 2020 Permit, sample analysis for a parameter (other than oil sheen) may be reduced to one annual discharge in the fourth quarter for a period of three years following eight consecutive quarters where samples complied with the applicable benchmark value for that parameter. The Port violated these requirements by failing to analyze discharge samples for the parameters as identified in Table 2 below, which includes instances where the Port improperly claimed analysis was not required under the Permits' consistent attainment provisions.

| TABLE 2: Pollutant Parameters Not Analyzed | | |
|---|---|---|
| **Monitoring Period** | **Monitoring Point** | **Parameters Not Analyzed** |
| Fourth Quarter 2015 | T2 | Turbidity, pH, Total Copper, Total Zinc |
| | T4 | Turbidity, pH, Total Zinc |
| First Quarter 2016 | T2 | Turbidity, pH, Total Copper, Total Zinc |
| | T4 | Turbidity, pH, Total Zinc |
| Second Quarter 2016 | T2 | Turbidity, pH, Total Copper, Total Zinc |
| | T4 | Turbidity, pH, Total Zinc |
| Third Quarter 2016 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Fourth Quarter 2016 | T2 | Turbidity, pH, Total Copper, Total Zinc |
| | T4 | Turbidity, pH, Total Zinc |
| First Quarter 2017 | T4 | Turbidity, pH, Total Zinc |
| Second Quarter 2017 | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |

9

| Second Quarter 2018 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Third Quarter 2018 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| | T4 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |
| Fourth Quarter 2019 | T2 | Turbidity, pH, Oil Sheen, Total Copper, Total Zinc, Petroleum Hydrocarbons |

**C.      Failure to Comply with Visual Monitoring Requirements.**

Condition S7.A of the Permits requires that monthly visual inspections be conducted at the facility by qualified personnel. Each inspection is to include: observations made at stormwater sampling locations and areas where stormwater associated with industrial activity is discharged; observations for the presence of floating materials, visible oil sheen, discoloration, turbidity, odor, etc. in the stormwater discharges; observations for the presence of illicit discharges; a verification that the descriptions of potential pollutant sources required by the permit are accurate; a verification that the site map in the SWPPP reflects current conditions; and an assessment of all BMPs that have been implemented (noting the effectiveness of the BMPs inspected, the locations of BMPs that need maintenance, the reason maintenance is needed and a schedule for maintenance, and locations where additional or different BMPs are needed).

Condition S7.C of the Permits requires that the Port record the results of each inspection in an inspection report or checklist that is maintained on-site and that documents the observations, verifications, and assessments required. The report/checklist must include: the time and date of the inspection; the locations inspected; a statement that, in the judgment of the person conducting the inspection and the responsible corporate officer, the facility is either in compliance or out of compliance with the SWPPP and the Permit; a summary report and schedule of implementation of the remedial actions that the Port plans to take if the site inspection indicates that the facility is out of compliance; the name, title, signature, and certification of the person conducting the facility inspection; and a certification and signature of the responsible corporate officer or a duly authorized representative.

The Port is in violation of these requirements of Condition S7 of the Permits because, during the last five years, it has failed to conduct each of the requisite visual monitoring and inspections, failed to prepare and maintain the requisite inspection reports or checklists, and failed to make the requisite certifications and summaries.

**V.      ILLICIT AND PROHIBITED DISCHARGES.**

Condition S5.E of the Permits prohibit the discharge of process wastewater (including stormwater that comingles with process wastewater) and illicit discharges. Appendix 2 to the Permits define "illicit discharges" as "any discharge that is not composed entirely of stormwater…." Operations at the facility include the loading of bulk commodities, including

copper ore, urea, and grain, to vessels docked at the facility, the unloading of these same materials from vessels docked at the facility to upland portions of the facility, and the cleaning of structures and equipment used in loading and unloading operations. Upon information and belief, during these activities, some of the bulk commodities, including copper ore, urea, grain, and dust from these bulk commodities, escape the facility's systems, structures, and equipment and spill into the Columbia River in violation of Condition S5.E of the Permits. These prohibited discharges occurred each and every day over the past five years that bulk commodities or other materials were loaded to or off-loaded from ships and that structures and equipment used in loading and unloading operations were cleaned. These prohibited discharges are reasonably likely to continue to occur.

Condition S7.B.3.b of the Permits require the Port to eliminate illicit discharges within 30 days of discovery, and Condition S3.B.4.b.i.7 of the Permits require the Port's SWPPP to include measures to identify and eliminate illicit discharges to surface waters. The Port has violated and continues to violate these requirements by failing to include BMPs in its SWPPP and to implement such BMPS that identify and eliminate the illicit discharges identified above. These violations have occurred every day during the last five years and are continuing to occur.

Additionally, Condition S7.B.3.a of the Permits requires the Port to notify Ecology within seven days of any discovery of an illicit discharge. The Port violated and continues to violate these requirements by failing to notify Ecology of the illicit discharges described above within seven days of each occurrence. These violations have occurred each time the Port identified these illicit discharges during the last five years.

Moreover, the Permits authorize only the discharges of stormwater and pollutants contained in stormwater. The Port has not been issued an NPDES permit authorizing discharges of bulk commodities, such as copper ore, urea, grain, and dust from these bulk commodities. Discharging these materials directly to the Columbia River from the facility, facility operations and activities, and facility structures and equipment constitutes unpermitted point-source discharges of pollutants to surface waters in violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a). These violations occurred and continue to occur each and every day over the past five years that bulk commodities or other materials were loaded to or off-loaded from ships and that structures and equipment used in loading and unloading operations were cleaned. These prohibited discharges are reasonably likely to continue to occur.

## VI.    CORRECTIVE ACTION VIOLATIONS.

### A.    Failure to Implement Level One Corrective Actions.

Condition S8.B of the Permits requires the Port take specified actions, called "Level One Corrective Action," each time quarterly stormwater sample results exceed any of the benchmark values described in Conditions S5.A and S5.B. Condition S8.A of the 2020 Permit requires the Port to implement any Level One Corrective Action required by the 2015 Permit

For a Level One Corrective Action, Condition S8.B.1.a of the Permits requires the Port to "[c]onduct an inspection to investigate the cause" of the benchmark exceedance. Additionally,

for a Level One Corrective Action, Condition S8.B of the Permits requires the Port to: (1) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the Permits and contains the correct BMPs from the applicable Stormwater Management Manual; (2) make appropriate revisions to the SWPPP to include additional operational source control BMPs with the goal of achieving the applicable benchmark values in future discharges and sign and certify the revised SWPPP in accordance with the Permits; and (3) summarize the Level One Corrective Action in the Annual Report required under Condition S9.B of the 2015 Permit and Condition S9.C of the 2020 Permit. Condition S8.B of the Permits requires the Port to implement the revised SWPPP as soon as possible, and no later than the DMR due date for the quarter the benchmark was exceeded.

Condition S5.A and Table 2 of the Permits establish the following applicable benchmarks: total copper 14 µg/L; and total zinc 117 µg/L.

The Port violated the Level One Corrective Action requirements of the Permits described above by failing to conduct a Level One Corrective Action in accordance with permit conditions, including the required investigation, the required review, revision, and certification of the SWPPP, the required implementation of additional BMPs, and the required summarization in the annual report each time in the past five years that quarterly stormwater sampling results were greater than a benchmark, including such the benchmark excursions during that time that are listed in Table 1 in Section II.A of this letter.

These benchmark excursions are based upon information currently available to Columbia Riverkeeper from Ecology's publicly available records. Columbia Riverkeeper provides notice of its intent to sue the Port for failing to comply with all of the Level One Corrective Action requirements described above each time during the last five years that quarterly stormwater sampling results were greater than a benchmark.

**B.      Failure to Implement Level Two Corrective Actions.**

Condition S8.C of the Permits requires the Port take specified actions, called "Level Two Corrective Action," each time quarterly stormwater sample results exceed any of the benchmark values described in Conditions S5.A and S5.B for any two quarters in a calendar year. Condition S8.A of the 2020 Permit requires that the Port implement any Level Two Corrective Action required by the 2015 Permit.

As described by Condition S8.C of the Permits, a Level Two Corrective Action requires the Port: (1) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the Permits; (2) make appropriate revisions to the SWPPP to include additional structural source control BMPs with the goal of achieving the applicable benchmark value(s) in future discharges and sign and certify the revised SWPPP in accordance with Condition S3 of the Permits; and (3) summarize the Level Two Corrective Action (planned or taken) in the Annual Report required under Condition S9.B of the Permits. Condition S8.C.4 of the Permits requires that the Port implement the revised SWPPP according to condition S3 of the Permits and the applicable stormwater management manual as soon as possible, but no later than August 31 of the following year.

12

The Permits establish the benchmarks applicable to the Port described in Section VI.A of this notice of intent to sue letter.

The Port violated the requirements of the Permits described above by failing to conduct a Level Two Corrective Action in accordance with permit conditions—including the required review, revision, and certification of the SWPPP; the required implementation of additional BMPs to ensure that all points of discharge from the facility meet benchmarks (not just the sampled point of discharge), including additional structural source control BMPs; and the required summarization in the annual report—each time since and including 2015 that the Port's quarterly stormwater sampling results were greater than a benchmark for any two quarters during a calendar year. As indicated in Table 1 in Section II.A of this letter, these violations include, but are not limited to, the Port's failure to fulfill these obligations triggered by the exceedances in 2018 for total copper.

The benchmark excursions identified in Table 1 of this letter are based upon information currently available to Columbia Riverkeeper and from Ecology's publicly available records. Columbia Riverkeeper provides notice of its intent to sue the Port for failing to comply with all of the Level Two Corrective Action requirements each and every time quarterly stormwater sample results exceeded an applicable benchmark value for any two quarters during a calendar year, including any such excursions that are not reflected in Table 1 above, since and including 2014.

Condition S8.C.4.e of the Permits states, "For the year following the calendar year the Permittee triggered a Level 2 Corrective Action, benchmark exceedances (for the same parameter) do not count towards additional Level 2 or 3 Corrective Actions." These Conditions do not waive the Port's duty to complete any Level Two Corrective Actions because the Port failed to develop and implement previously triggered Level Two Corrective Actions pursuant to Condition S8.C of the Permits.

**C.     Failure to Implement Level Three Corrective Actions and to Comply with Ecology Orders Related Thereto.**

**1.     Level Three Corrective Actions Triggered Under the 2015 Permit.**

Condition S8.D of the Permits requires the Port take specified actions, called a "Level Three Corrective Action," each time quarterly stormwater sample results exceed an applicable benchmark value for any three quarters during a calendar year. Condition S8.A of the 2020 Permit requires that the Port implement any Level Three Corrective Action required by the 2015 Permit.

As described by Condition S8.D of the Permits, a Level Three Corrective Action requires the Port to: (1) review the SWPPP for the facility and ensure that it fully complies with Condition S3 of the Permits; (2) make appropriate revisions to the SWPPP to include additional treatment BMPs with the goal of achieving the applicable benchmark value(s) in future discharges and additional operational and/or structural source control BMPs if necessary for proper function and maintenance of treatment BMPs; and (3) summarize the Level Three

13

Corrective Action (planned or taken) in the Annual Report required under Condition S9.B of the 2015 Permit and Condition S9.C of the 2020 Permit, including information on how monitoring, assessment, or evaluation information was (or will be) used to determine whether existing treatment BMPs will be modified/enhanced, or if new/additional treatment BMPs will be installed.

Condition S8.D.2 of the Permits requires that a Qualified Industrial Stormwater Professional review the revised SWPPP, sign the SWPPP Certification Form, and certify that it is reasonably expected to meet the ISGP benchmarks upon implementation. Additionally, Condition S8.D.3 of the Permits requires that, before installing any BMPs that require the site-specific design or sizing of structures, equipment, or processes to collect, convey, treat, reclaim, or dispose of industrial stormwater, the Port submit an engineering report, certified by a licensed professional engineer, to Ecology for review. The report must contain: (1) a brief summary of the treatment alternatives considered and why the proposed option was selected, including cost estimates of ongoing operation and maintenance and disposal of any spent media; (2) the basic design data, including characterization of stormwater influent and sizing calculations for the treatment units; (3) a description of the treatment process and operation, including a flow diagram; (4) the amount and kind of chemicals used in the treatment process, if any; (5) the expected results from the treatment process including the predicted stormwater discharge characteristics; and (6) a statement, expressing sound engineering justification—through the use of pilot plant data, results from similar installations, and/or scientific evidence—that the proposed treatment is reasonably expected to meet the permit benchmarks. The engineering report must be submitted no later than the May 15 prior to the Level Three Corrective Action Deadline. Condition S8.D.3.c of the Permits requires that an operations and maintenance manual be submitted to Ecology at least 30 days after construction/installation is complete.

Condition S8.D.5 of the Permits requires that the Port fully implement the revised SWPPP according to Condition S3 of the Permits and the applicable stormwater management manual as soon as possible, but no later than September 30 of the following year.

The Permits establish the benchmarks applicable to the Port described in Section V.A of this notice of intent to sue letter.

The Port violated the requirements of the Permits described above by failing to conduct a Level Three Corrective Action in accordance with applicable permit conditions—including the required review, revision and certification of the SWPPP, including the requirement to have a specified professional design and stamp the portion of the SWPPP pertaining to treatment; the required implementation of additional BMPs, including additional treatment BMPs to ensure that all points of discharge from the facility meet benchmarks (not just the sampled point of discharge); the required submission of an engineering report, plans, specifications, and an operations and maintenance plan; and the required summarization in the annual report—each time since and including 2015 that the Port's quarterly stormwater sampling results were greater than a benchmark for any three quarters during a calendar year. As indicated in Table 1 in Section II.A of this letter, these violations include, but are not limited to, the Port's failure to fulfill these obligations triggered by exceedances of the benchmark for total copper in 2015, 2016, 2017, and 2019.

The benchmark excursions identified in Table 1 are based upon information currently available to Columbia Riverkeeper from Ecology's publicly available records. Columbia Riverkeeper provides notice of its intent to sue the Port for failing to comply with all of the Level Three Corrective Action requirements each and every time quarterly stormwater sample results exceeded an applicable benchmark value for any three quarters during a calendar year, including any such excursions that are not discussed herein, since and including 2015.

Condition S8.D.5.e of the Permits state, "For the year following the calendar year the Permittee triggered a Level 3 Corrective Action, benchmark exceedances (for the same parameter) do not count towards additional Level 2 or 3 Corrective Actions."). Similarly, Condition S8.D.5.d of the Permits states: "While a time extension is in effect, benchmark exceedances (for the same parameter) do not count towards additional Level 2 or 3 Corrective Actions. These Conditions do not waive the Port's duty to complete any Level Three Corrective Actions because the Port failed to develop and implement previously triggered Level Three Corrective Actions pursuant to Condition S8.D of the Permits and failed to comply with Ecology's administrative orders granting time extensions.

**2.      Level Three Corrective Actions Triggered in 2010 and Ecology's Administrative Orders Related Thereto.**

Prior to the 2015, the Port was covered by the ISGP issued by Ecology on October 21, 2009, effective on January 1, 2010, modified on May 16 and July 1, 2012, and that expired on January 1, 2015 under the same permit number—WAR000424 (the "2010 Permit"). Condition S8.D of the 2010 Permit included Level Three Corrective Action requirements that are substantially similar to those contained in the 2015 and 2020 Permits. Further Condition S8.A of the 2015 Permit requires that the Port implement any Level Three Corrective Action required by the 2010 Permit and Condition S8.A of the 2020 Permit requires that the Port implement any Level Three Corrective Action required by the 2015 Permit. The Port triggered Level Three Corrective Actions under the 2010 Permit for total zinc and total copper with stormwater monitoring conducted in 2010, requiring the implementation of Level Three Corrective Actions by September 30, 2011.

In response to a request by the Port, Ecology issued an order dated September 27, 2011, Order No. 8719, extending the deadline for these Level Three Corrective Actions until September 30, 2014. Order 8719 required: (1) the Port advise Ecology on the status of complying with the Level Three Corrective Actions in annual reports submitted under Permit Condition S9.B; (2) the Port submit an engineering report that meets the requirements of WAC 173-240-130 for Ecology's review and approval on or before September 30, 2013, and (3) the Port install, and have operational, a stormwater treatment system that is designed with the goal of achieving the applicable benchmark values as soon as practicable, but no later than September 30, 2014.

On July 3, 2013, the Port requested that Ecology extend the deadlines for the engineering report and for implementation of the stormwater treatment system each by one year, to September 30, 2014 and September 30, 2015, respectively. Ecology issued an order dated September 20, 2013, Amended Order No. 10260, amending Order No. 8719, extending the

15

deadline for the engineering report by six months but not extending the deadline for implementation of the stormwater treatment system. Amended Order 10260 required that the Port submit an engineering report to Ecology for review and approval by March 31, 2014 that includes: (1) a brief summary of the treatment alternatives considered and why the proposed options was selected; (2) the basic design data and sizing calculations of the treatment units; (3) a description of the treatment process and operation, including a flow diagram; (4) the amount and kind of chemicals used in the treatment process, if any; (5) the results to be expected from the treatment process, including the predicted stormwater discharge characteristics, (6) a statement expressing sound engineering justification through the use of pilot plant data, results from similar installations, and/or scientific evidence that the proposed treatment is reasonably expected to meet the permit benchmarks; (7) an operations and maintenance manual; and (8) a certification by a licensed professional engineer. No other requirements of Ecology Order No. 8719 were amended.

The Port submitted an engineering report to Ecology dated February 19, 2014 proposing retrofits to the Terminal 4 Pond, including Floating Treatment Wetlands. The engineering report did not meet the requirements of Ecology Order 8719 and Ecology Amended Order No. 10260 identified above. Ecology issued a review of the engineering report dated April 29, 2014, in which it declined to approve the report because, *inter alia*, the report failed to demonstrate that the proposed measures would achieve benchmarks. The Port subsequently requested that the engineering report be withdrawn.

On August 4, 2014, the Port requested that Ecology further extend the Level Three Corrective Action deadline by an additional three years—to September 30, 2017. Ecology issued an order dated August 27, 2014, Amended Order No. 10920, amending Ecology Amended Order No. 10260 and Ecology Order No. 8719, extending the Level Three Correction Action deadline. Amended Order No. 10920 required: (1) installation of Tideflex valve, hydrodynamic separators, and additional cells in the Terminal 4 retention pond by September 30, 2014; (2) upgrades to the bulk copper concentrate offloading facility by September 30, 2017, that include enclosing the bulk offloading point and conveyors inside a negative pressure structure with air handling equipment and baghouses to control dust emissions; and (3) continuation of ongoing evaluation and pilot testing of floating treatment wetlands, installation of downspout filters jet cleaning of stormwater conveyance systems, increased sweeping frequency, and completion of Level Three treatment BMP installation to meet permit benchmark concentrations by September 30, 2017. No other requirements of Ecology Order 8719 and Ecology Amended Order No. 10260 were amended.

The Port has violated the requirements described above, including Condition S8.D of the 2010 Permit, Condition S8.A of the 2015 Permit, Condition S8.A of the 2020 Permit, Ecology Order 8719, Ecology Amended Order 10260, and Ecology Amended Order No. 10920, by failing to fully implement Level Three Corrective Actions for total copper and total zinc as required, including the required engineering report; the required operations and maintenance manual; the required review, revision and certification of the SWPPP, including the requirement to have a specified professional design and stamp the portion of the SWPPP pertaining to treatment; the required implementation of additional BMPs, including additional treatment BMPs to ensure that

all points of discharge from the facility meet benchmarks (not just the sampled point of discharge); and the required summarization in the annual report.

## VII.   VIOLATIONS OF THE RECORDKEEPING REQUIREMENTS.

### A.   Failure to Record Information.

Condition S4.B.3 of the 2015 Permit and Condition S4.B.4 of the 2020 Permit require the Port to record and retain specified information for each stormwater sample taken, including the sample date and time, a notation describing if the Port collected the sample within the first 12 hours of stormwater discharge event, an explanation of why the Port could not collect a sample within the first 12 hours of a stormwater discharge event, the sample location, method of sampling and preservation, and the individual performing the sampling. Condition S4.B.3 of the 2015 Permit also requires the Port to record weather conditions. Upon information and belief, the Port violated and violates these conditions because it failed to record each of these specified items for each sample taken during the last five years.

### B.   Failure to Retain Records.

Condition S9.C of the 2015 Permit and Condition S9.D of the 2020 Permit require the Port to retain, for a minimum of five years, a copy of the Permits, a copy of the Port's coverage letter, records of all sampling information, inspection reports including required documentation, any other documentation of compliance with permit requirements, all equipment calibration records, all BMP maintenance records, all original recordings for continuous sampling instrumentation, copies of all laboratory results, copies of all required reports, and records of all data used to complete the application for the Permits. Upon information and belief, the Port is in violation of these conditions because it has failed to retain records of such information, reports, and other documentation during the last five years.

## VIII.   FAILURE TO REPORT PERMIT VIOLATIONS.

Condition S9.E of the 2015 Permit and Condition S9.F of the 2020 Permit require the Port to take certain actions in the event the Port is unable to comply with any of the terms and conditions of the Permit which may endanger human health or the environment, or exceed any numeric effluent limitation in the permit. In such circumstances, the Port must immediately take action to minimize potential pollution or otherwise stop the noncompliance and correct the problem, and the Port must immediately notify the appropriate Ecology regional office of the failure to comply. The Port must then submit a detailed written report to Ecology, including specified details, within 5 days of the time the Port became aware of the circumstances unless Ecology requests an earlier submission.

The Port has repeatedly violated these requirements, including each and every time the Port failed to comply with the corrective action requirements described in Section VI of this notice of intent to sue, each and every time an unpermitted and illicit discharge occurred, and every time the Port discharged stormwater with concentrations of pollutants that are likely to

cause or contribute to violations of water quality standards as described herein. All these violations may endanger human health or the environment.

## IX.  REQUEST FOR SWPPP.

Pursuant to Condition S9.G of the 2020 Permit, Columbia Riverkeeper hereby requests that the Port provide Columbia Riverkeeper a copy of, or access to, the Port's SWPPP complete with all incorporated plans, monitoring reports, checklists, and training and inspection logs. The copy of the SWPPP and any other communications about this request should be directed to Brian Knutsen at the address below.

Should the Port fail to provide the requested complete copy of, or access to, its SWPPP as required by Condition S9.G of the 2020 Permit, the Port will be in violation of that condition, which violation shall also be subject to this Notice of Intent to Sue and any resulting lawsuit.

## X.  PARTY GIVING NOTICE OF INTENT TO SUE.

The full name, address, and telephone number of the party giving notice is:

Columbia Riverkeeper
407 Portway Ave, Suite 301
Hood River, OR 97031
(541) 399-5312

## XI.  ATTORNEYS REPRESENTING COLUMBIA RIVERKEEPER.

The attorneys representing Columbia Riverkeeper in this matter are:

| | |
|---|---|
| Simone Anter, Staff Attorney | Brian A. Knutsen |
| Columbia Riverkeeper | Kampmeier & Knutsen, PLLC |
| 407 Portway Ave, Suite 301 | 1300 S.E. Stark Street, Suite 202 |
| Hood River, OR 97031 | Portland, Oregon 97214 |
| (541) 399-5312 | (503) 841-6515 |
| simone@columbiariverkeeper.org | brian@kampmeierknutsen.com |

## XII.  CONCLUSION.

The above-described violations reflect those indicated by the information currently available to Columbia Riverkeeper based on its review of the public record. These violations are ongoing. Columbia Riverkeeper intends to sue for all violations, including those yet to be uncovered and those committed after the date of this Notice of Intent to Sue.

Under Section 309(d) of the CWA, 33 U.S.C § 1319(d), the Port is subject to a separate daily penalty assessment for each violation. The maximum daily penalty assessment for violations occurring after November 2, 2015 is $55,800; the maximum daily penalty assessment for violations occurring on and before November 2, 2015 is $37,500. 40 C.F.R. § 19.4. In

addition to civil penalties, Columbia Riverkeeper will seek injunctive relief to prevent further violations under Sections 505(a) and (d) of the CWA, 33 U.S.C. § 1365(a) and (d), and such other relief as is permitted by law. Also, Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing parties to recover costs, including attorney's fees.

Columbia Riverkeeper believes that this NOTICE OF INTENT TO SUE sufficiently states grounds for filing suit. Columbia Riverkeeper intends, at the close of the 60-day notice period, or shortly thereafter, to file a citizen suit against the Port under Section 505(a) of the CWA for the violations described herein.

Columbia Riverkeeper is willing to discuss effective remedies for the violations described in this letter and settlement terms during the 60-day notice period. If you wish to pursue such discussions in the absence of litigation, we suggest that you initiate those discussions within ten (10) days of receiving this notice so that a meeting can be arranged and so that negotiations may be completed promptly. We do not intend to delay the filing of a complaint if discussions are continuing when the notice period ends. If you believe that any of the allegations in this Notice are incorrect or based on incomplete information in the public record, please bring those facts to our attention.

Very truly yours,

KAMPMEIER & KNUTSEN, PLLC

By: _____

Brian A. Knutsen

cc.     Simone Anter, Columbia Riverkeeper Staff Attorney

19

## CERTIFICATE OF SERVICE

I, Brian A. Knutsen, declare under penalty of perjury of the laws of Washington and the

United States that I am counsel for Columbia Riverkeeper and that on November 5, 2020, I

caused copies of the foregoing Notice of Intent to Sue Under the Clean Water Act and Request

for Copy of Stormwater Pollution Prevention Plan to be served on the following by depositing

them with the United States Postal Service, certified mail, return receipt requested, postage

prepaid:

Julianna Marler, CEO
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Kent Cash, Chief Operations Officer
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Patty Boyden, Director of Environmental Services
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Don Orange, District One Commissioner
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Eric LaBrant, District Two Commissioner
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Jack Burkman, District Three Commissioner
Port of Vancouver USA
3103 NW Lower River Road
Vancouver, WA 98660

Administrator Andrew Wheeler
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Ave., N.W. (Mail Code 1101A)
Washington DC 20460

Regional Administrator Christopher W. Hladick
U.S. Environmental Protection Agency, Region 10
1200 Sixth Avenue (Mail Code 21-B03)
Seattle, WA 98101

Director Laura Watson
Washington Department of Ecology
P.O. Box 47600
Olympia, WA 98504-7600

Brian A. Knutsen, WSBA No. 38806

# ATTACHMENT A



Port of Vancouver
Industrial Stormwater General Permit WAR000424
January 2019